May it please the court. My name is LeVar Taylor. I'm representing Lindsay Jones, the petitioner appellant in this case. Tax court below made two determinations that we believe were incorrect. Tax court determined that my client implicitly or tacitly consented to the filing of a joint return for the year 2010. And the tax court rejected my client's claim for innocence both for 2009 and because the court determined that there was a joint return filed for 2010 for the 2010 year as well. Now it's helpful to take a stroll through the timeline of the facts in this case because the tax court simply ignored a significant amount of evidence in the record in this case. And this was not a trial where there was a lot of disputed facts. The testimony of the individuals is uncontroverted. There were a few places where we're not quite sure when things happened but this is not a case of he said she said. This is a case where the testimony was laid out and the tax court simply ignored the testimony that favored my client. So we started the beginning in 2002. Jones marries Pike. She's 19. He's in his early 30s. She's out of high school. She has no experience in dealing with taxes. During the marriage, Pike controls the household finances and he's very good at it. He's responsible. He pays household bills on time. He's responsible in dealing with taxes. He sees that the tax returns are prepared and filed and that the taxes are paid during the marriage up through 2008. The marriage however is not happy. Mr. Pike doesn't sleep in the marital bed. He sleeps on the sofa. He's not he admitted he was not a social person in his personal life and he could be mean but they do manage to have one son during the marriage. During the marriage, Jones always signs her own name to the forms 1040 that are joint filed up through 2008. She never allows Pike to sign her name. In fact, she never owns just the tax returns. In 2008, they separate. Pike moves to the basement briefly and then moves out of the house. They meet with attorney mediator Watson. Watson gets data from them and he then computes both spousal support and child support and Pike from that point in time starts paying spousal support and child support pursuant to the you know to what the mediator said although the spousal support is actually four hundred dollars less than the amount computed by the mediator using the software that's used in divorce cases here in Southern California called DisoMaster. So, Pike pays the support all the way through 2011 when the spousal support obligation ends. Pays it on time. Post separation, Jones is busy. She's trying to raise a young son. She's going to school to get a degree in interior design and she's working part-time making less than $20,000 a year in each of the years 09 and 10. In 2009, they sell their house. Some of that money is used to pay the 2008 taxes which are timely file. $20,000 is left over to go to Jones. $20,000 is left over to go to Pike. Pike testified at this time he was saving $40,000 to pay his 2009 taxes. Post separation, Jones is not given any information which changes her perception of Pike being financially responsible and being capable of paying taxes. Pre-separation, she believed that the family's his family business for whom Pike worked was successful. Pre-separation, Pike successfully and confidently handles bills and taxes. In 2010, Pike and Jones go back to the mediator, Watson, to complete the marital settlement agreement and that settlement agreement is finalized and signed at the beginning of February of 2011. Nowhere in that MSA is there anything discussing the fact that Pike did not pay his income. Had Ms. Jones filed the timely returns separate for 09 and 10, she would have received small refunds. So we're dealing now with taxes on Pike's income. Pike conceals the fact that he has not paid taxes on his own income. He conceals it from the mediator and he conceals it from Ms. Jones in the MSA because the MSA simply does not address that. Under California law, family code 771, the earnings post-separation pre-divorce earnings of a spouse are their own separate property and it follows that any tax obligation they have under state law, it's their separate obligation. The MSA also does not deal with the $100,000 in savings which Pike testified that he had. This is the money he saved up, part of it to pay the 2009 and he lent it to his parents and then he had $55,000 of unpaid taxes or unpaid wage checks that he considered to be his assets. The MSA doesn't deal with that because Pike concealed the existence of those assets as well. May I ask you, just to be sure I'm clear on your position, my understanding and tell me if this is correct please, is you're not disputing that the tax court correctly stated the governing law on the tacit consent rule. You're challenging the application of that rule to the facts here, is that right? Tax court made one legal error, okay. The one legal error the tax court made was that it looked to the fact that my client allowed her current husband to sign their joint M40s and relied upon that uh to support the finding that my client tacitly consented to the filing of joint of a joint 2010 return with her ex-husband, okay. And that's a legal error. It's at the time, understand at the time like that my client's name was signed by her ex-spouse, this is November 15, 2011 is the date on the on the fourth M40 for 2010. She had remarried, she was pregnant with second child. She remarried in September and her testimony was she got pregnant one month later. So for the court to say, well she tacitly consented, that consent obviously and adversely, you know, it's not consent at all because it affected not just her but her current husband, her existing child and her child that was in her womb. So suppose we agree with you that reliance on that, that they shouldn't have relied on that fact. We still have the fact that she had given Mr. Pike her W-2s and the other forms that one would need to use to prepare the 2010 return and then and there's nothing in the record that suggests she ever asked for it back and then she didn't file her own return. So why why aren't those two things, you know, pieces of evidence that strongly support the conclusion that she was tacitly consenting to having him file the 2010 return? I mean, if he wasn't going to file the 2010 return, like it doesn't seem like she had any other plan for how it was going to get filed. Well, understand she had an aversion to taxes. So I mean, lots of us do, but that's really neither here or there, is it? Well, with respect to the giving of information on this record, that doesn't support the court's conclusion because that's what she did every year before and every year before she never allowed him to sign the return. Okay, so if you're looking for a pattern, the pattern and she would give him the information, but she would sign the return. So her giving him the information for 2010, which was done at his request, okay, this is not something she volunteered, but he testified, yes, I asked for it. Counsel, is the essence of your, oh, I'm sorry, counsel, is the essence of your argument that the tax court failed to take into account the situation as of the time the return was actually filed as opposed to whatever the situation was in 2010? Well, I think under either situation, I mean, the answer to your question is, yes, that's our primary argument because of the 2010 was not prepared until October of 2012, okay, but there was no discussion between the parties at all and I testified that Mr. Pike never discussed with her the 2010 return, never called her up, never did anything, okay, and he conveniently couldn't remember, but I don't think, but we're dealing with, we're dealing with the tax court's decision and I just want to be sure I understand your argument, is it your argument that the tax court failed to take into account the changed circumstances as of the time the return was filed as opposed to what it might have been perhaps back in 2010? Well, the tax, the tax court, it's, well, it's actually both. The tax court erred under either situation. Okay, thank you. Is there anything in the record that would shed any light on Ms. Jones's intent to file jointly or not? I understand she got remarried, but is there anything in the record that suggests that because she got remarried, she would have treated the 2010 tax return any differently? She seems like she shouldn't give any much thought one way or the other. You know, she generally didn't think about taxes, but is there anything in the record that suggests, well, now that I got remarried, I want to somehow treat the 2010 tax return differently? Well, the only evidence of the record is that she was, she was asked whether she would have, you know, signed the return had she known everything at the time it was prepared and she said no. So there's that. That was in, that was in this litigation, right? I guess, correct. That was the testimony. Okay. That's correct. And, and, and so again, the providing of the information really provides not much support in the factual context of this case. And in the Shea case in the sixth circuit, okay. The parties were still living together and married in the sixth circuit said, wait a minute. She did not, the wife did not tacitly consent. So this case is very different. And, and even in, in, into the Shea case, there was a history of filing joint returns and the sixth circuit said, yeah, we know that's, we know it's there, but you have to look at that. That that's just one factor to take into account. And based on the facts of that case, the we're, you know, we're concluding that, you know, the, the trial court clearly erred in concluding that there was tacit consent. I mean, there is no, and now I'll, I'll touch briefly on the innocent spouse case because there were multiple errors committed by the tax court. One of them was connection with significant benefit. I mean, here, what happened? They went to the attorney mediator. He computed the amount of the spouse of support, which is very modest. My client got less than that amount computed by $400 a month. There was no benefit of anything beyond normal support my client. And in fact, Mr. Pike did benefit. The court said, well, well, the taxpayer didn't benefit from taxpayer. Husband didn't benefit from not paying his taxes. The government even argued that, and well, he spent, I don't know how many thousands of dollars on a girlfriend. And he had a nice place in Newport beach. He was spending money on at the time. He was claiming that he was only making $1,300 a month when he came in to modify his, his child support. So the tax court erred in that respect. The tax court also erred in the know or reason to know the record of this case is quite clear that my client had no actual knowledge that the task court below said, well, she, you know, signed her name and it was only an inch and a half below the number on the return. But when you look at the history, let's assume for a second, and my client had seen it and acknowledged it. The facts of this case are that at the time she signed the return in early 2011, she had no reason to believe that he would not pay it. He had a perfect compliance history from her perspective. He paid all his bills, household bills. He filed the taxes on time. He lied about the existence of the taxes. He actively misled her. We don't know when she signed the return, but it was prepared in March. And it's logical. She would have signed it wrong when it was prepared. One month later in April, he signs under penalty of perjury, false statements saying that he doesn't know any taxes for 2009 or 10. So he actively misled her. And it's the presence of the deceit that hangs over this case that the tax court absolutely failed to acknowledge. It changes the whole character of the case. When you're, when your spouse, your soon to be ex-spouse lies to you and doesn't tell you. Okay. But even aside from that, had no reason to believe he was making the financial disclosure said he was making $170,000 a year. Even if he didn't have the savings, he could have paid it off in an installment agreement. The taxes for the nine were only $40,000. I'll reserve the rest of my time for rebuttal. Thank you. Thank you. And we'll hear from the government now. Good morning. It's afternoon here in DC. I'm Karen Gregory for the commissioner of internal revenue. Does the court have any questions? Well, I guess I'll start with one, which is, why was it appropriate for the tax court to rely on the fact that she let Mr. Johnson, the second husband sign her name on the 2010 return or the 2012 return that that seems fact that she's willing to let her current husband sign a return for doesn't seem terribly probative of whether she'd be willing to let her ex-husband sign a return for a prior year. So why was it appropriate to look at that? The tax court did not place as that much weight on aspect of all the facts and circumstances. The court actually said that the fact that her signature was missing was not decisive because she thereafter had delegated signature on her joint returns to her new husband. There's something I would like to bring to the court's attention, which is section 6064 of the internal revenue code. And under that provision signatures on returns are presumptively authentic. And that section provides that the fact that an individual's name is signed on a return is prima facie evidence for all purposes that the return was actually signed by her. So that's the beginning of this inquiry. This return, unlike the Shea case, had two signatures on the joint return. That return was facially valid, and the IRS, therefore, is entitled to treat the return as joint, which it did here. Treating the return as joint is presumptively correct. And when an individual challenges her signature on the return, that's when the tacit consent rule applies to determine whether she tacitly consented to the return. The tacit consent rule is the longstanding precedent in the tax court, and the tax court correctly applied it here. Whether the individual tacitly consented to make a joint return is determined by all the facts and circumstances of the case. And her subsequent husband signing for her is just one of multiple facts and circumstances here. Most significantly... Counsel, if I may ask, aren't we looking at the 2010 return, which was filed in November of 2012? Are we not? Yes. Okay. As to the 2010 return, did the tax court, as you said, apply all of the appropriate circumstances? Did the tax court take into account that her situation had changed dramatically between the time that it would normally be returned, let's say April of 2011, and the time that it actually got filed, which was November of 2012? Well, what's significant here, and this case is unusual because of that gap in time, as you've pointed out, but what's significant here is that... And yes, the tax court did properly consider all the facts and circumstances in finding that there was tacit consent. What's significant here is her independent obligation under the Internal Revenue Code to file a return because her income is over the threshold. She provided her forms W-2, which on their face say that they are for purposes of preparing a return. She provided those to Mr. Pike and then made any inquiry about whether he had filed the return, timely or otherwise, whether there was a liability, whether it had been paid. So the minimal information and her independent legal duty create a duty to inquire, and she never inquired. So that's one of all of the facts and circumstances here. She did not file any, and she also did not file any other return. This was the return that she made for the year, and she was content with that until she found out about the unpaid liability. Now, another significant factor here is witness credibility, and this trial was in March of 2017 before the pandemic. It was an in-person trial, and the trial judge is in a unique position to describe as missing findings or, in fact, findings that were not made because implicitly, the tax court did not find Ms. Jones' testimony to be credible. Significantly, the tax court found that Watson had testified credibly and also found that Pike had testified credibly. There's a silence there with respect to Ms. Jones, and in one respect, with respect to her reason to know, which is on the spectrum from actual knowledge to duty to inquire, in that regard, the tax court found that her testimony was disingenuous. So the significance of that is that Ms. Jones simultaneously testified that she trusted Pike completely to file returns and pay taxes, and is simultaneously testifying that she did not trust him to sign her name. Well, that inconsistency, as well as the commissioner's impeachment of Ms. Jones with respect to various things toward the end of her testimony, colors the situation here. So yes, her circumstances has changed, but Ms. Jones never inquired about the return, and she had a legal obligation to all of the facts and circumstances from early 2011 when she gave her forms W-2 to Pike, and she didn't know that the return profiled in 2012. She found out when the state of California attempted to garnish her wages, and then after that, she learned about the federal liability. So really, with respect to the 2010 return and the 2009 return nonpayments, this case turns in many respects on her failure to inquire, and her noncompliance with internal revenue law was the weightiest factor that the court applied with respect to the request for discretionary relief from joint and several liability. So to answer Judge O'Scanlan's question, the task force did consider all of these things either expressly or implicitly in determining that the facts developed in a trial de novo supported the inference of TASA consent, and those facts included providing the W-2's long history of filing joint returns and relying on Pike to file joint returns even after their separation, the inclusion of Ms. Jones's deductions on the joint return, and most significantly, Ms. Jones's failure to file any other return for 2010 despite her legal obligation to do so. So all of these facts and circumstances and her duty to inquire, the court talked about the duty to inquire in the context of the revenue procedure factors, but it's also a significant factor here in terms of all the facts and circumstances surrounding the 2010 return, and also significantly, the internal revenue code provision that entitles the IRS to treat that as a valid joint return facially, and then the court correctly applied the TASA consent rule and correctly found TASA consent. Does the court have any questions about the revenue procedure factors? Or the 2010 return or anything else? Looks like there are none. I'm sorry. It appears that there are no questions. Okay, thank you. The audio is a little fuzzy. As there are no questions, the government will rest on the briefs. The court should affirm the task force decision because it was correct. Thank you. Thank you. Mr. Taylor, you've saved a minute for rebuttal. I have a simple question. How in the world do you consent to something when you've been lied to? Mr. Pike lied about the existence of the liability. He said there were none. He lied about his ability to pay. How can anybody consent under those circumstances? It's simply not possible, and the tax court below ignored all of that evidence. Counsel, could you respond specifically to Ms. Gregory's point that it was Ms. Jones's duty to inquire? It seems to me that's a crucial issue. Well, there's no duty to inquire when it comes to tacit consent. She was referring to the revenue procedure, which deals with the innocent spouse case, the status, relief from joint liability. That's the revenue procedure. I've never seen a case involving tacit consent where there was a duty where they said you have a duty to inquire. That's a non-separator. Okay. All right. Thank you, counsel. We thank both counsel for their helpful arguments, and the case, just argued, is submitted. Thank you.
judges: O'SCANNLAIN, MILLER, LEE